# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# NORTHERN DIVISION

| | |
|---|---|
| JUSTIN POTTER, Derivatively on Behalf of DOW, INC., | Case No: |
| Plaintiff, | |
| v. | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| JIM FITTERLINE, JEFFREY L. TATE, KAREN S. CARTER, RICHARD K. DAVIS, SAMUEL R. ALLEN, GAURDIE E. BANISTER JR., WESLEY G. BUSH, JERRI DEVARD, DEBRA L. DIAL, JEFF M. FETTIG, JACQUELINE C. HINMAN, REBECCA B. LIEBERT, LUIS ALBERTO MORENO, JILL S. WYANT, and DANIEL W. YOHANNES, | |
| Defendants, | **JURY TRIAL DEMANDED** |
| and, | |
| DOW INC., | |
| Nominal Defendant. | |

Plaintiff Justin Potter ("Plaintiff"), by and through his undersigned counsel, derivatively on behalf of Dow, Inc. ("Dow" or the "Company"), submits this Verified Shareholder Derivative Complaint (the "Complaint"). Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including

filings by the Company with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action brought in the right, and for the benefit, of the Company against certain of its officers and directors seeking to remedy the Individual Defendants' (defined below) violations of state and federal law and have caused substantial harm to the Company.

## JURISDICTION

2.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 as Plaintiff's claims raise a federal question under Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78n(a)(1) and Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367(a). This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

3.     This Court has personal jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum

contacts with this District to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

4.  Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because: (i) one or more of the defendants either resides in or maintains executive offices in this District; (ii) a substantial portion of the transactions and wrongs complained of herein, including defendants' primary participation in the wrongful acts detailed herein and aiding and abetting and conspiracy in violation of fiduciary duties owed to the Company, occurred in this District; (iii) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District; and (iv) defendants have otherwise purposefully availed themselves of this District through issuing false statements in this District.

5.  In connection with the acts, transactions, and conduct alleged herein, the Individual Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## THE PARTIES

### Plaintiff

6.  Plaintiff is, and was at relevant times, a shareholder of the Company. Plaintiff will fairly and adequately represent the interests of the shareholders in

3

enforcing the rights of the corporation.

**Nominal Defendant**

7.     Nominal Defendant Dow is a Delaware corporation with principal executive offices located at 2211 H.H. Dow Way, Midland, Michigan 48674. Dow's common stock trades in an efficient market on the New York Stock Exchange ("NYSE") under the ticker symbol "DOW."

**Director Defendants**

8.     ***Defendant Jim Fitterling*** ("Fitterling") has served as the Company's Chief Executive Officer ("CEO") and Chair of the Company's Board of Directors ("Board") at all relevant times.

9.     ***Defendant Richard K. Davis*** ("Davis") has served as a director of the Company at all relevant times. Defendant Davis also serves as Chair of the Audit Committee and as a member of the Compensation and Leadership Development Committee and the Corporate Governance Committee.

10.     ***Defendant Samuel R. Allen*** ("Allen") has served as a director of the Company at all relevant times. Defendant Allen also serves as the Chair of the Corporate Governance Committee and as a member of the Compensation and Leadership Development Committee.

11.     ***Defendant Gaurdie E. Banister Jr.*** ("Banister") has served as a director of the Company at all relevant times. Defendant Banister also serves as a

member of the Compensation and Leadership Development Committee and the Corporate Governance Committee.

12.     **Defendant Wesley G. Bush** ("Bush") has served as a director of the Company at all relevant times.  Defendant Bush also serves as a member of the Corporate Governance Committee and the Environment, Health, Safety, and Technology Committee.

13.     **Defendant Jerri DeVard** ("DeVard") has served as a director of the Company at all relevant times.  Defendant DeVard also serves as a member of the Audit Committee and the Environment, Health, Safety, and Technology Committee.

14.     **Defendant Debra L. Dial** ("Dial") has served as a director of the Company at all relevant times.  Defendant Dial also serves as a member of the Audit Committee and the Environment, Health, Safety, and Technology Committee.

15.     **Defendant Jeff M. Fettig** ("Fettig") has served as a director of the Company at all relevant times.   Defendant Fettig also serves as Chair of the Compensation and Leadership Development Committee and as a member of the Corporate Governance Committee.

16.     **Defendant Jacqueline C. Hinman** ("Hinman") has served as a director of the Company at all relevant times.  Defendant Hinman also serves as Chair of the Environment, Health, Safety, and Technology Committee and as a member of the

Compensation and Leadership Development Committee and the Corporate Governance Committee.

17.     **Defendant Rebecca B. Liebert** ("Liebert") has served as a director of the Company at all relevant times. Defendant Liebert also serves as a member of the Audit Committee and the Environment, Health, Safety, and Technology Committee.

18.     **Defendant Luis Alberto Moreno** ("Moreno") has served as a director of the Company at all relevant times.  Defendant Moreno also serves as a member of the Compensation and Leadership Development Committee and the Environment, Health, Safety, and Technology Committee.

19.     **Defendant Jill S. Wyant** ("Wyant") has served as a director of the Company at all relevant times. Defendant Wyant also serves as a member of the Compensation and Leadership Development Committee and the Environment, Health, Safety, and Technology Committee.

20.     **Defendant Daniel W. Yohannes** ("Yohannes") has served as a director of the Company at all relevant times.  Defendant Yohannes also serves as a member of the Audit Committee and the Corporate Governance Committee.

21.     The above-named defendants are collectively referred to herein as the "Director Defendants."

6

**Officer Defendants**

22.     ***Defendant Jeffrey L. Tate*** ("Tate") has served as Dow's Chief Financial Officer ("CFO") at all relevant times.

23.     ***Defendant Karen S. Carter*** ("Clinton) has served as Dow's Chief Operating Officer ("COO") at all relevant times.

24.     Defendants Tate and Carter along with Defendant Fitterling are collectively referred to herein as the "Officer Defendants."

25.     The Director Defendants and Officer Defendants are collectively referred to herein as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

**Background**

26.     Dow is an American materials science company, serving customers in the packaging, infrastructure, mobility, and consumer applications industries. Dow conducts its worldwide operations through six (6) global businesses organized into three (3) operating segments: (i) Packaging & Specialty Plastics, (ii) Industrial Intermediates & Infrastructure, and (iii) Performance Materials & Coatings.

27.     Historically, Dow has touted its "industry-leading dividend," which is of particular importance to investors.  On conference calls with investors and analysts, Dow's CEO, Defendant Fitterling, has variously stated that the Company's

"dividend is a key element of our investment thesis," and that "north of 65% of our owners count on that dividend."

28.     Notwithstanding an ongoing slump in the materials science industry, as well as the recent onset of tariff-related market uncertainties, the Individual Defendants represented that Dow was well positioned to weather macroeconomic and tariff-related headwinds while maintaining sufficient levels of financial flexibility to support the Company's lucrative dividend. Specifically, the Individual Defendants cited various purported strengths and advantages unique to Dow in its industry, including, *inter alia*, the Company's purported "differentiated portfolio," "cost-advantaged footprint," and "industry-leading flexibility to navigate global trade dynamics."

## MATERIALLY FALSE AND MISLEADING STATEMENTS

29.     On January 30, 2025, the Company issued a press release, reporting its financial results for the fourth quarter ("Q4") of 2024.  The press release quoted Defendant Fitterling as stating:

> ***Despite persistently weak macroeconomic conditions, Team Dow delivered our fifth consecutive quarter of [Y/Y] volume growth, leveraging our cost-advantaged footprint to capture resilient demand for high-value applications.*** In December, we signed a definitive agreement for the sale of a minority stake in select U.S. Gulf Coast infrastructure assets for expected cash proceeds of up to approximately $3 billion. The partnership represents a new business model ***designed to drive operational efficiencies and growth with new customers, while providing near-term financial flexibility***. We also announced a strategic review of select European assets, and today we are announcing

additional actions to deliver $1 billion of targeted cost reductions. *These collective actions represent a continuation of Dow's commitment to maintaining our strong financial foundation* and supplementing near-term cash flow.[1]

30.    With respect to the Company's outlook for 2025, the same press release quoted Defendant Fitterling as stating:

> *We remain confident that Dow will benefit from the completion of our near-term incremental growth projects and an enhanced focus on operational discipline in 2025. In addition, we are optimistic that we will see further demand growth in attractive end markets such as packaging, energy and electronics . . . . Our differentiated portfolio and strong balance sheet enable us to deliver on all our capital allocation priorities, including an industry-leading dividend.* Until we see more definitive indications of a true recovery taking hold – and in order to deliver improved margins – we are taking actions to reduce our costs by $1 billion as well as our 2025 CapEx [capital expenditure] plans by $300 - 500 million. We will complete these actions while staying the course on our long-term strategic priorities. Our proactive interventions are necessary for Dow to continue to successfully navigate this economic downcycle.

31.    The same day, the Company hosted a conference call with investors and analysts to discuss its Q4 2024 financial results. During his prepared remarks on the call, Defendant Fitterling continued to tout Dow's ability to "deliver . . . [Y/Y] volume growth despite continued weak macroeconomic conditions" and ultimately "foster a sustainable future, achieve long-term profitable growth, and enhance shareholder returns."   He continued to tout the Company's "near-term growth investments" that "will enable improved underlying earnings and margins across the

---

[1]    Unless otherwise stated, all emphasis herein is added.

cycle," Dow's "differentiated portfolio and proactive actions to support our solid financial foundation," and Defendants' purported "confiden[ce] in our ability to deliver on all of our capital allocation priorities, including our industry-leading dividend."

32.    Similarly, Defendant Tate downplayed concerns with demand and sales across the Company's various markets notwithstanding deteriorating macroeconomic conditions and headwinds. For instance, with respect to the Company's Packaging & Specialty Plastics segment, Defendant Tate acknowledged that "[i]n China, manufacturing activity remains tepid and overall demand in Europe continues to be soft," but that, "in packaging, we continue to see demand growth, especially in North America with resilient domestic and export polyethylene demand throughout the year."

33.    With respect to the Company's Industrial Intermediates & Infrastructure segment, Defendant Tate reassured investors that "planned maintenance activity scheduled at our ethylene oxide asset in . . . Texas . . . will enable the start-up of additional alkoxylation capacity in the US Gulf Coast," touting "[t]his new capacity" as one of several "near-term growth investments" that purportedly "should support higher sales beginning in the second-quarter" of 2025.

34.    In addition, with respect to the Company's Performance Materials & Coating segment, Defendant Tate represented that "we expect the seasonal demand

uptick in [the] first quarter [of 2025] to provide a tailwind of approximately $75 million" notwithstanding "soft[ness]" in "building and construction end-markets" and "high mortgage rates in the US and sector weakness in China."

35.    On the same call, in response to an analyst's question regarding whether "if demand is unfortunately similar in 2025 versus 2024, . . . directionally, should EBITDA [earnings before interest, taxes, depreciation, and amortization] be up, down, flat," Defendant Fitterling stated:

> On 2025 versus 2024, obviously, a big part of the $1 billion of cost actions we're taking are to underpin improved EBITDA in 2025. So *we've got volume growth and I mentioned the projects that we'll have starting out this year, which all of them will be able to be sold-out and be accretive from the point that they start-up. So you'll have that.* We're obviously not counting on a tremendous amount, *although we've shown five consecutive quarters of volume growth. So we're still going to keep taking advantage of our low-cost position and get our share.* But I think pricing power is the real question and that's the reason for the cost action is to underpin the improvement in EBITDA. I would say you also have to think about the markets and a lot will depend on demand in the markets. In PNSP [Packaging & Specialty Plastics], well, I'd say in the ethylene chain, in general, *PNSP and ethylene oxide derivatives have continued to be strong. You see that strength in Industrial Solutions. You see that strength.* Although we had some pricing slip in the fourth quarter. *Overall, we see that strength in the integrated margins of PNSP. So I think that will continue to be a positive sign.* I think we'll continue to take the actions that we need to take in Europe to tighten things up there.

* * *

> And then, of course, cash, we're going to manage very carefully, which is why you saw the CapEx reductions that we announced to try to stay in a better cash-flow position and *keeping our dividend strong is one of the number one priorities.*

11

36.     Further, in response to another analyst's inquiry regarding "the risk and potential mitigation activities you could do around tariffs, specifically around Canada," Defendant Fitterling attested to the Company's visibility into tariff-related impacts on the Company's business while downplaying the same, stating:

> I think the most important thing is what we're doing right now, which is engage with the administration on providing data for ourselves and also for the industry to understand the situation. ***And we're starting to see every day like more refinement on what's happening.*** I think it's pretty clear in the near-term of the discussion is around getting control over immigration and the flow of fentanyl into United States.

37.     On February 4, 2025, the Company filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operating results for its Q4 and full year ended December 31, 2024 (the "2024 10-K"). The 2024 10-K was reviewed, approved, and signed by Defendants Allen, Banister, Bush, Davis, DeVard, Dial, Fettig, Fitterling, Hinman, Moreno, Tate, Wyant, and Yohannes. The 2024 10-K contained substantively the same statements made by Defendant Fitterling, as referenced above, with respect to the Company's outlook for 2025, touting the Company's purported "near-term incremental growth projects," expectations for "demand growth in attractive end-markets," and ability to maintain "an industry-leading dividend" by virtue of its purported "differentiated portfolio and strong balance sheet."

38.     With specific respect to Dow's outlook for its Packaging & Specialty

Plastics segment in 2025, the 2024 10-K stated:

> In Packaging & Specialty Plastics, ***supply improvements driven by new polyethylene capacity coming online during 2025, combined with improved reliability, will allow the Company to continue to drive volume growth and improve margins***. Local prices are expected to be impacted by market supply and demand dynamics as well as volatility in feedstocks due to sensitivity to external economic and geopolitical factors. ***The Company's feedstock flexibility and advantaged regional footprint will continue to position the segment well to navigate market dynamics throughout the year. In-region presence and superior derivative flexibility will allow the segment to continue to optimize price and volume mix.***

39.     Likewise, with respect to the Company's outlook for its Industrial

Intermediates & Infrastructure segment in 2025, the 2024 10-K stated:

> In Industrial Intermediates & Infrastructure, ***improved demand is expected based on improving fiscal conditions*** resulting from interest rate cuts across several regions. ***The Company will benefit from the full-year impact of resumed production at the Louisiana Operations Glycol-2 unit in Plaquemine, Louisiana***, which successfully restarted in June 2024. ***Recent and in-flight growth investments in specialty amines and alkoxylation capacity are expected to support long-term, above GDP volume growth in key markets*** including energy transition, pharmaceuticals and consumer health, and sustainable surfactants.

40.     Similarly, with respect to the Company's outlook for its Performance

Materials & Coatings segment in 2025, the 2024 10-K stated:

> In Performance Materials & Coatings, the Company will continue to prioritize key end-markets in performance silicones in which its ***innovation and footprint can drive value and volume growth above GDP. Pricing for specialty products is expected to remain relatively stable, with anticipated modest but steady economic expansion. Volume growth is expected in feedstocks and intermediates on***

*improved regional supply and demand dynamics*, and while competitive pressures in the market impacting local price persist, *lower interest rates are expected to drive improved demand and local price*. *Market conditions impacting sales of coatings are expected to improve compared with recent years* based on lower interest rates and an increase in residential spending.

41.     Appended as exhibits to the 2024 10-K were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), wherein Defendants Fitterling and Tate certified that the 2024 10-K "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report"; and that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of [Dow] as of, and for, the periods presented in this report."

42.     On February 28, 2025, the Director Defendants issued the 2025 Proxy Statement which solicited shareholder votes in favor of, *inter alia*: (i) the re-election of the Director Defendants to the Board; and (ii) executive compensation.

43.     Regarding the Board's role in risk oversight the 2025 Proxy Statement stated:

**BOARD'S ROLE IN THE OVERSIGHT OF RISK MANAGEMENT**

The Board is responsible for overseeing overall risk management for the Company, including review and approval of the enterprise risk

management approach and process implemented by management to identify, assess, manage and mitigate risk, at least annually. Each Committee is responsible for oversight of specific risk areas relevant to their respective Charters. Risk management is considered a strategic priority within the Company, and responsibility for managing risk rests with management while the Committees and the Board as a whole provide oversight. The Company has processes in place to identify, assess and monitor risks, which are part of the company's overall risk management process and have been embedded in the Company's operating procedures, internal controls and information systems.

### *Enterprise Risk Management Approach and Process*

The enterprise risk management approach and process is conducted by Dow's strategic planning and business analysis function. This function is structurally independent of business lines. This function is led by the Senior Vice President of Corporate Development, who is responsible for risk management identification, assessment, and monitoring of risk management performance on an operational level. This role reports to the CEO. The enterprise risk management approach and process identifies, assesses, manages and mitigates risks. ***Risks are assessed on an annual basis using a broad range of inputs, both internal and external to Dow, including, but not limited to***, strategic alignment; interrelation of risks; ***macroeconomic, industry, sustainability, geopolitical and regulatory trends***; operations and safety; financial performance, including investor and rating agency perspectives; regulatory and compliance actions; market dynamics; and top risks highlighted by sources such as the World Economic Forum, The Conference Board, and industry consultants. Risks are then reviewed and categorized based on prioritization and risk tolerance, considering the potential impact and likelihood of a significant event occurring within the next five years. The results are reviewed by a varied, cross-functional leadership team representing each of Dow's businesses, functions and geographic regions. Each risk is assigned to a member of the leadership team and, if needed, internal subject matter experts accountable for a mitigation plan. Key risks that have specified mitigation actions are reviewed more regularly in leadership team meetings. Key risks, including short and intermediate term risks, and emerging risks are also regularly evaluated at meetings of the Committees and Board, including risks with economic, environmental

and social impacts. In addition, the Board believes that having an Independent Lead Director enhances the Board's independent oversight of the Company's risk mitigation efforts by enabling consultation between the Chair and Independent Lead Director on time-sensitive or urgent risks. Principal risks which may negatively impact the future results of the Company are reviewed at least quarterly and a detailed discussion is included in the section titled "Risk Factors" in the Company's Annual Report on Form 10-K and subsequent Quarterly Reports on Form 10-Q.

***Risks may also be reassessed from time to time based on factors such as changes in the external and macroeconomic environment***, concerns identified by management or the Board, or through detection in Dow's internal work processes.

44.    The foregoing in the 2025 Proxy Statement was false and misleading, however, because it represented to shareholders that the Director Defendants adequately monitored macroeconomic trends and were thus equipped for any macroeconomic headwinds.

45.    Furthermore, by choosing to speak about the Board's oversight of macroeconomic risks, the Director Defendants were also required to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." The Director Defendants failed to disclose, *inter alia*, Dow's actual ability (or lack thereof) to mitigate macroeconomic and tariff-related headwinds, as well as maintain the financial flexibility needed to support its lucrative dividend. The Director Defendants also failed to disclose the true scope and severity of the foregoing headwinds' negative impacts on Dow's business and financial

condition, particularly with respect to competitive and pricing pressures, softening global sales and demand for the Company's products, and an oversupply of products in the Company's global markets. The Director Defendants' failure to disclose these issues violated Item 303 because these issues represented known trends or uncertainties that were likely to have a material unfavorable impact on the Company's business and financial results.

46.    The 2025 Proxy Statement harmed Dow by interfering with its shareholders' right to cast a fully informed vote regarding critical governance issues affecting Dow.

47.    Upon the false and misleading statements and omissions in the 2025 Proxy Statement, shareholders voted to approve each of the proposals in the 2025 Proxy Statement, including for the re-election of each Director Defendant.

48.    On April 24, 2025, the Company issued a press release reporting its financial results for the first quarter ("Q1") of 2025.  The press release quoted Defendant Fitterling as stating:

> We remain focused on disciplined execution and increased actions to improve profitability and support cash flow . . . . ***Despite ongoing macroeconomic challenges, Team Dow delivered a sixth consecutive quarter of [Y/Y] volume growth while taking actions to reduce costs and right-size capacity . . . . Today's announcements build on Dow's cost actions that are already underway, aiming to further strengthen our financial flexibility and support a balanced capital allocation approach.***

49.     Also, on April 24, 2025, the Company hosted a conference call with investors and analysts to discuss its Q1 2025 financial results. On this call, Defendant Fitterling downplayed the true scope and severity of the deteriorating macroeconomic environment's impact on the Company's business and financial condition, while overstating the Company's ability to weather the same. Defendant Fitterling stated:

> *[I]n the face of volatile macroeconomic conditions, team Dow focused on operational discipline while taking actions to reduce costs and align capacity to the slower GDP conditions that are impacting our industry. We delivered our sixth consecutive quarter of [Y/Y] volume growth* . . . . Sequentially, net sales were flat. This reflected lower pricing in industrial intermediates and infrastructure and performance materials and coatings, *which was offset by downstream growth in silicones as a result of improvements in home and personal care and electronic end markets, as well as seasonally higher demand in building and construction and DIC*.

* * *

> As our industry weathers the current challenging conditions, we're executing several proactive and decisive actions to improve margins support near-term cash flow, and optimize our global portfolio. We're doing so today in a manner that is consistent with our best owner mindset and a balanced capital allocation approach. *Our purpose-built asset footprint and our low-cost feedstock positions primarily in The Americas and The Middle East, create a meaningful cost advantage for Dow and provide industry-leading flexibility to navigate global trade dynamics.* We're focused on improving our margins by reducing our spending and matching regional supply to profitable demand. As we've outlined throughout today's call, we have line of sight to $6 billion in near-term cash flow improvement.

* * *

18

The Dow team is closely monitoring the current uncertain macro environment and *we're taking the necessary actions to further improve our competitive position* including looking for additional ways to reduce costs, and increase our competitiveness. Our near-term strategic priorities are focused on navigating the challenges our industry is facing. *By delaying the Alberta project, maintaining financial flexibility, protecting our balance sheet, rationalizing assets in high-cost regions, reducing costs, and focusing on profitable growth, we are positioning Dow for long-term success through the cycle.*

50.    On this same call, Defendant Carter touted "the [purported] power of [Dow's] competitive advantages and track record of solid execution in various market conditions" notwithstanding a weak macroeconomic environment and tariff-related uncertainties, stating:

We are moving with urgency to deliver strong operational and financial results through this persistent down cycle. *We are taking a hard look at everything across the enterprise with a sharp focus on driving volume growth, capturing price, and taking actions in the near term that will enhance profitability and improve margins.* We will continue to accelerate our cost savings actions and are looking for additional opportunities to build on what we are already delivering.

* * *

*In addition to the comprehensive set of actions underway, we are adjusting our business to current market realities by leveraging our strategic asset footprint global reach, low-cost position, and unmatched feedstock flexibility. More specifically, we have a leading or low-cost position and world-class manufacturing sites in every geography, with well-developed, agile regional supply chain. And a deep understanding of the needs of our customers.* And are the only company with integrated polyethylene production on four continents. In addition, *Dow's unique feedstock flexibility allows us to optimize our assets based on regional advantages. We have the ability to crack*

*the most optimal fee slate. And have the widest range to take advantage of dynamic periods.*

*This ability to capitalize on preferred feedstocks, paired with our breadth of process technologies, enables Dow to optimize what, where, and how we produce our products* to best serve our customers. And while the tariff environment remains fluid, we estimate greater than 95% of our North American volume is USMCA [United States–Mexico–Canada Agreement] compliant *which is an advantage for Dow . . . . [W]e have engaged in rigorous scenario planning to identify potential additional cost pressures and mitigation strategies. Altogether, our unmatched cost position and feedstock flexibility superior product mix, and geographic diversity are strong differentiators that give Dow a competitive edge today and throughout the cycle.*

51.    Also on this call, Defendant Tate asserted that "[w]e still expect demand to be positive for the year," notwithstanding "global demand remain[ing] well below historical average GDP levels" and "[r]ecent disruption from tariffs," reiterated that "Dow's global footprint with low-cost assets in all regions should position us well to navigate current market dynamics," and assured investors that, "[s]hould we gain insights into substantial changes during the quarter, we're committed to maintaining transparency, and we'll provide timely updates accordingly."

52.    In addition, Defendant Tate represented that the Company enjoyed "important flexibility in the midst of this low-growth environment, and increased macroeconomic and geopolitical uncertainty" as a result of "Dow's commitment to financial discipline" and "proactive actions we're taking to effectively manage this

20

extended down cycle" which were "expect[ed] . . . to provide approximately $6 billion in near-term cash support"—all of which overstated the Company's financial stability and ability to maintain its dividend despite ongoing macroeconomic and tariff-related headwinds.  Defendant Tate concluded:

> Our collective actions to navigate the realities of the current macroeconomic environment and deliver $6 billion in cash support over the next two years, enable Dow to maintain our financial flexibility. Our balance sheet remains solid, with no substantive debt maturities due until 2027 . . . .

> We will continue to seek options where Dow can proactively take action to improve our capital structure *through this type of activity or derisking as we've done in the past.* We remain focused on delivering on our balanced capital allocation approach over the cycle.

53.    Later during the call, Defendant Fitterling continued to downplay macroeconomic and tariff-related concerns in response to related questions by analysts. For instance, Defendant Fitterling stated:

> We have an advantage in that we have footprint Canada, US, Argentina, Middle East. *We have the ability to flex the supply chain and to mitigate tariff impacts on where we export our materials.*

> *So it's very positive.* We also have the advantage that greater than 95% of everything we move between The United States and Canada is USMCA compliant. *So I think those things will have a positive impact.* But we just need a little bit better clarity on where these tariffs land and what that impact is on overall demand.

> \* \* \*

> *[We h]ave a very active tariff and trade team that is engaged on all sides of that.* And, of course, a lot comes down to what's gonna be on an exemption list, and what isn't gonna be on an exemption list. *So*

*we're optimistic that some discussions will start, and we'll get some clarity around that as the quarter develops. In the meantime, we're doing things that we need to do to flex that supply chain.*

54.    Also, Defendant Carter stated:

*[W]e are well on our way on reconfiguring our supply chain.* The team has been working since really, you know, the middle of the first quarter. On this. *And so we are able to export quite a bit more product out of Canada. And then, of course, in The United States, our low-cost position enables us to produce for the local demand.* As a matter of fact, the growth project that [Defendant Fitterling] alluded to, Poly seven, that's going to start up in the second quarter is going to provide us even more flexibility to supply even more of that U.S. demand right here. And then, of course, we've got, you know, four on four continents sprayed a polyethylene production. So think about The Middle East as well. *As an opportunity for us to supply demand around the world but also direct in China.*

*So we are well positioned. We feel good about where we are. And able to mitigate the tariffs directly.*

\* \* \*

[In] our industrial solutions business . . . , *although we are seeing softening demand, we are seeing awful pockets of stability.* Markets like energy, home care, and pharma end markets. *Data centers, an example, is a significant growth opportunity for us*, and our solutions there are used in things like thermal management. I do just, though, just wanna double down the new asset that we're gonna start up there here in the second quarter. In The U.S. For new alkoxylation capacity. That unit is going to focus on growth and attractive end markets for us. So home and personal care and pharma. And, really, the good news around that asset is about 50% of that capacity is already contracted for. *We expect that to provide us with a tailwind going into the second half.*

55.    The above-referenced statements were materially false and misleading as well as failed to disclose material adverse facts about the Company's business,

operations, and prospects. Specifically, the Individual Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company's ability to mitigate macroeconomic and tariff-related headwinds, as well as to maintain the financial flexibility needed to support its lucrative dividend, was overstated; (ii) the true scope and severity of the foregoing headwinds' negative impacts on the Company's business and financial condition was understated, particularly with respect to competitive and pricing pressures, softening global sales and demand for the Company's products, and an oversupply of products in the Company's global markets; and (iii) as a result, the Individual Defendants' public statements were materially false and misleading at all relevant times.

56.    In addition, the Individual Defendants violated Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303(b)(2)(ii) ("Item 303"), which required Dow to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." The Individual Defendants failed to disclose, *inter alia*, Dow's actual ability (or lack thereof) to mitigate macroeconomic and tariff-related headwinds, as well as maintain the financial flexibility needed to support its lucrative dividend. The Individual Defendants also failed to disclose the true scope and severity of the foregoing headwinds' negative impacts on Dow's business and financial condition, particularly with respect to competitive and pricing

pressures, softening global sales and demand for the Company's products, and an oversupply of products in the Company's global markets. The Individual Defendants' failure to disclose these issues violated Item 303 because these issues represented known trends or uncertainties that were likely to have a material unfavorable impact on the Company's business and financial results.

## **THE TRUTH EMERGES**

57.    On June 23, 2025, BMO issued a report on the Company, downgrading its recommendation on the Company to "Underperform" from "Market Perform" while also cutting its PT on the Company's stock to $22.00 per share from $29.00 per share, stating:

> The significant weakness across [Dow's] end-markets resulting in soft pricing and lower vol[ume]s/op[erating] rates is likely to result in severely challenged [second quarter] EBITDA and [second-half-of-2025] estimates coming solidly lower. Looking at 2026, barring a change in the macro (or significant supply closures), we believe DOW's 2026 EBITDA is set to come in ~$1b[illio]n below consensus. Finally, with no end in sight for these anemic earnings levels, there appears a heightened risk DOW may cut the dividend.

58.    On this news, the Company's stock price fell $0.89 per share, or 3.21%, to close at $26.87 per share on June 23, 2025.

59.    Then, on July 24, 2025, the Company issued a press release reporting its financial results for Q2 2025 (the "Q2 2025 Earnings Release"). Therein, the Company reported a non-GAAP loss per share of $0.42, significantly larger than the approximate $0.17 to $0.18 per share loss expected by analysts.  The Company also

reported net sales of $10.1 billion, representing a 7.3% Y/Y decline and missing consensus estimates by $130 million, "reflecting declines in all operating segments." The Company further reported, inter alia, that "[s]equentially, net sales were down 3%, as seasonally higher demand in Performance Materials & Coatings was more than offset by declines across the other operating segments."

60.     Defendant Fitterling, as quoted in the Q2 2025 Earnings Release, blamed these disappointing results on "the lower-for-longer earnings environment that our industry is facing, amplified by recent trade and tariff uncertainties," while disclosing that "[w]e are . . . adjusting our dividend to ensure we maintain a balanced capital allocation framework" and to "provide additional financial flexibility to help guarantee we maximize shareholder value, both in the current environment and as the industry recovers."  As quoted in the same press release, Defendant Fitterling also provided a dour outlook going forward, citing "signs of oversupply from newer market entrants who are exporting to various regions at anti-competitive economics" and the need for "broader industry engagement and additional regulatory action to restore competitive dynamics."

61.     In a separate press release issued the same day, the Company revealed that it was cutting its dividend in half, from $0.70 per share to only $0.35 per share, citing the need for "financial flexibility amidst a persistently challenging macroeconomic environment."

62.     The foregoing disclosures shocked investors and analysts alike. Indeed, within approximately an hour after markets opened on July 24, 2025, multiple analysts expressed surprise over the Company's disappointing results. For instance, a Citi analyst noted that "[w]hile expectations were already low, DOW's [Q2 2025] earnings came in well below that, as pricing pressure continued to challenge" and the Company missed "against a lowered bar." Likewise, a Vital Knowledge analyst characterized Dow's Q2 2025 results as "pretty bad" and falling short "across the board," stating that "[t]he company didn't come close to earning the dividend."

63.     Indeed, following publication of the Q2 2025 Earnings Release and the Company's announcement that it was cutting its dividend in half, the Company's stock price fell $5.30 per share, or 17.45%, to close at $25.07 per share on July 24, 2025.

64.     The following day, in an article entitled "Dow Price Targets Fall Post-Earnings," *Bloomberg* reported that fourteen analysts had cut their PT on the Company's stock by an average of 13%.

## DAMAGE TO THE COMPANY

### Securities Class Action

65.     On August 29, 2025, a securities class action complaint was filed in the United States District Court for the Eastern District of Michigan against the Company and the Officer Defendants. The complaint alleges violations of Sections

26

10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder, in the case captioned: *Sarti v. Dow, Inc., et al.*, Case No. 2:25-cv-12744 (E.D. Mich.) ("Securities Class Action").

66.     As a result of the wrongs complained of herein, the Individual Defendants have subjected the Company to the significant cost of defending itself and certain of the Company's officers.   The Company will continue to incur significant sums in relation to the Securities Class Action and any liability or settlement that results.

**Unjust Compensation**

67.     At all relevant times, the Company paid lucrative compensation to each of the Individual Defendants. The Company paid the Individual Defendants in connection with their respective roles as officers and/or directors of the Company.

68.     Accordingly, as part of their respective roles, the Individual Defendants were required to, among other things, exercise due care and diligence in the management and administration of the affairs of the Company, act ethically and in compliance with all laws and regulations, maintain adequate internal controls, and conduct business in a fair and transparent manner.   Further, each of the Individual Defendants had additional duties and responsibilities owed to the Company by virtue of their executive, directorial and/or committee roles, as described *infra*, for which they were compensated for.

69.     However, the Individual Defendants failed to carry out their duties adequately or at all, causing harm to the Company, as alleged herein.  Because the Individual Defendants failed to carry out their respective duties, the compensation they received was excessive and undeserved.  As such, the Individual Defendants were unjustly enriched to the detriment of the Company.

**Additional Damage to the Company**

70.     In addition to the damages specified above, the Company will also suffer further losses in relation to any internal investigations and amounts paid to lawyers, accountants, and investigators in connection thereto.

71.     The Company will also suffer losses in relation to the Individual Defendants' failure to maintain adequate internal controls, including the expense involved with implementing and maintaining improved internal controls.

72.     The Company has also suffered, and will continue to suffer, a loss of reputation as a direct and proximate result of the Individual Defendants' misconduct which will plague the Company's share price going forward.

## CORPORATE GOVERNANCE

73.     At all relevant times, the Company had in place extensive corporate governance documents imposing duties and responsibilities on its directors and officers, and additional duties on the Company's committee members. Accordingly,

each of the Individual Defendants were required to comply with the corporate governance documents, as detailed below.

74.    Despite the following corporate governance, the conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Individual Defendants were aware posed a risk of serious injury to the Company.

**Code of Conduct**

75.    At all relevant times, Dow had in place its Code of Conduct which "applies to all directors, officers, and full- and part-time employees of Dow Inc." and "provides a framework to make good choices: to abide by the law and be highly principled and socially responsible in all of our business practices."

76.    The Code of Conduct opens with a letter from Defendant Fitterling which states:

> To preserve the trust of our stakeholders and uphold our Company's Values of Integrity, Respect for People and Protecting Our Planet, we must all work together to achieve the right results, the right way. No excuses. No shortcuts. The Dow Inc. Code of Conduct is a guide to the behaviors and principles of conduct that we expect from each of our employees – no matter our roles or where we are located. I encourage you to carefully read the Code and refer to it for guidance.
>
> We each have the duty to perform our jobs in an open, honest and ethical manner even when it is not to our advantage. Exercising good

judgment also entails speaking up if you have concerns or suspect any activity that violates our Code of Conduct or the law. At Dow, we will not tolerate retaliation against anyone who reports concerns in good faith. The Dow EthicsLine is a toll-free line, available 24 hours a day, 7 days a week, for those who wish to ask questions about Dow's policy, seek guidance on specific situations or report possible violations.

Remember, your actions matter. You set the example in maintaining the highest professional business standards and leading others in doing the same. By living with integrity and embracing the principles of the Code, we each help create a Company that our customers want to do business with, a great place to work and a trustworthy investment for our shareholders.

77.    With respect to "Business and financial records," the Code of Conduct states:

Business and financial records are essential to Dow's success. The integrity and accuracy of these records help internal decision-making and are the basis of our reporting to shareholders, investors, creditors, government agencies and other stakeholders. We must:

•    Keep and present all Company records and reports in accordance with the law, our internal control policies, and generally accepted accounting principles. These records include accounting records as well as any other electronic or written records, such as expense reports, time sheets, medical claim forms, personnel records and reviews, and the wide variety of analytical, engineering and technical reports generated by the Company.

•    Establish and maintain a system of strong and effective internal controls.

•    Ensure that all Company records accurately and fairly reflect the underlying transaction.

•    Never falsify any document.

30

- Record all financial transactions in the proper account, department and accounting period.

- Ensure that all actions and commitments are in accordance with Dow's Authorization Policy and Delegation of Authority.

- Validate that all public communications, including reports to government authorities, are full, fair, accurate, timely and understandable.

- Raise any concerns and report any suspect misconduct related to the accuracy of Dow records with finance management or through another appropriate channel, such as the Dow EthicsLine.

78.    In highlighting "Integrity," the Code of Conduct states:

You are respected as an innovator of science, a supplier of choice and a powerful competitor. Through financial integrity and strong governance, we have successfully established credibility in the marketplace as a top-tier investment.

**Audit Committee Charter**

79.    At all relevant times, the Company had in place its Audit Committee Charter which sets forth the additional duties and responsibilities of the Audit Committee. The Audit Committee Chater states that the Audit Committee's primary purpose is to the assist the Board "in fulfilling its oversight responsibilities as set forth below and relating to:"

- the quality, reliability and integrity of the financial statements of the Company;

- the quality, reliability and integrity of environmental, social and governance reporting by the Company;

- the adequacy of the Company's internal controls particularly with respect to the Company's compliance with legal and regulatory requirements and corporate policy;

- the Company's internal audit function;

- the nomination of the independent auditor and the independent auditor's qualifications, independence and performance; and

- the application of the Company's accounting principles.

80.     The Audit Committee Charter further sets forth specific duties and responsibilities of the Audit Committee, as follows:

The Committee's duties and responsibilities shall be to:

- Regularly report to the Board. In connection therewith, the Committee should review with the Board any issues that arise with respect to the quality or integrity of the Company's financial statements, the Company's compliance with legal or regulatory requirements, the performance and independence of the independent registered public accounting firm, or the performance of the internal audit function.

- Conduct such additional activities and consider such other matters, within the scope of its responsibilities, as the Committee or the Board deems necessary or appropriate.

***

Financial Reporting and Disclosure

- Review with management and the independent registered public accounting firm of the Company's financial statements, disclosures and Management's Discussion and Analysis of Financial Condition and Results of Operations, and critical audit matters disclosed in the auditor's report to be included in the Company's Annual Report on Form 10-K and in its quarterly reports on Form 10-Q prior to filing such reports with the SEC.

Such review shall include a discussion with the independent registered public accounting firm regarding those matters required to be discussed under generally accepted auditing standards and applicable regulations.

• Discuss with the independent registered public accounting firm, and resolve, any problems or difficulties encountered during the course of the audit, management's response and any significant disagreements with management.

• Review and discuss with management the type and presentation of information to be included in the Company's press releases announcing financial results and, if applicable, guidance on financial results (especially the use of "pro forma" or "adjusted" information not prepared in compliance with generally accepted accounting principles), and the Company shall provide to the Committee in advance each such press release or other communication in which the Company may provide guidance on financial results and other financial information so the Committee may review and discuss with management (though the Committee need not discuss in advance each such press release or each instance in which the Company may provide guidance on financial results).

• Review with management (including the corporate auditor) and the independent registered public accounting firm (1) major issues regarding accounting principles and financial statements presentations, including any significant changes in the Company's selection or application of accounting principles or accounting conventions; (2) any analyses prepared by management and/or the independent registered public accounting firm setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative generally accepted accounting principles methods on the Company's financial statements; and (3) the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the financial statements of the Company.

***

33

<u>Internal Audit</u>

- Approve the appointment, removal and annual compensation of the corporate auditor.

- Review the internal audit charter, annual plan and scope of work and significant internal control findings.

- In collaboration with management, review and appraise the audit efforts of the Company's internal audit function, including the responsibilities, budget and staffing of the internal audit function.

<u>Compliance and Risk Processes</u>

- Review with management of the Company's administrative, operational and accounting internal controls, including any special audit steps adopted in light of the discovery of material control deficiencies and, in conjunction with the Corporate Governance Committee, the internal control framework and centralized processes related to the Company's environmental, social and governance reporting.

- Receive periodic reports from the independent registered public accounting firm, management and the internal audit function to assess the impact on the Company of significant accounting or financial reporting developments that may have a bearing on the Company.

- Communicate openly among and individually with the independent registered public accounting firm, management, the internal audit function, and the Board, and taking appropriate actions resulting from this interaction.

- Establish procedures for the receipt, retention and resolution of complaints regarding accounting, internal controls or auditing matters, including procedures for the confidential, anonymous submission of complaints by employees of the Company.

- Meet periodically with management to discuss current and, if any, proposed, guidelines and policies governing the processes used to assess, monitor and control the Company's major risk exposures, including climate-related or financial risk exposures, as well as, if any, actual major risk exposures.

- Meet periodically with the general counsel to review legal and regulatory matters, including (1) any matters that may have a material impact on the financial statements of the Company, and (2) any matters involving potential or ongoing material violations of law or breaches of fiduciary duty by the Company or any of its directors, officers, employees or agents or breach of fiduciary duty to the Company.

- Meet at least annually with senior management to review and approve the Company's global tax strategy and policy.

- Oversee the Company's cybersecurity and information security framework and risk management; meet at least annually with senior management to review and discuss the Company's cybersecurity program and information security policies and procedures including key risk areas and mitigation strategies; review periodic reports on any notable cyber threats or incidents.

- Review the effectiveness of the Company's systems, procedures and programs designed to promote and monitor compliance with applicable laws and regulations and receiving prompt reports from the general counsel, corporate auditor and/or the senior compliance person(s), as appropriate, on any compliance matter that could adversely impact the quality, reliability or integrity of the Company's external financial process or adequacy of the Company's internal controls.

- Oversee the Company's compliance programs, including code of business conduct and code of financial ethics, and, at least annually, meet to review the implementation and effectiveness of the Company's ethics and compliance programs with the Company's general counsel, who shall have the authority to communicate promptly and directly to the Committee about any matters involving criminal or potential criminal conduct.

- Review the Company's policies relating to the ethical handling of conflicts of interest and reviewing past or proposed transactions between the Company and members of management as well as policies and procedures with respect to officers' expense accounts and perquisites, including the use of corporate assets. The Committee shall consider the results of any review of these policies and procedures by the independent registered public accounting firm.

- In conjunction with the Corporate Governance Committee, review and recommend to the Board for approval any changes to the Company's code of business conduct and code of financial ethics (and any waivers as may be granted in accordance with such codes).

- The Committee shall prepare the report required by the rules of the SEC to be included in the Company's annual meeting proxy statement.

## DUTIES OF THE DIRECTOR DEFENDANTS

81.     As members of the Company's Board, the Director Defendants were held to the highest standards of honesty and integrity and charged with overseeing the Company's business practices and policies and assuring the integrity of its financial and business records.

82.     The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Director Defendants were aware posed a risk of serious injury to the Company.

83. By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Director Defendants owed the Company and its investors the fiduciary obligations of trust, loyalty, and good faith. The obligations required the Director Defendants to use their utmost abilities to control and manage the Company in an honest and lawful manner. The Director Defendants were and are required to act in furtherance of the best interests of the Company and its investors.

84. Each director of the Company owes to the Company and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets. In addition, as officers and/or directors of a publicly held company, the Director Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

85. To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and investing public;

(b)     conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)     remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws,

and rules and regulations; and

(f)     ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

86.     Each Director Defendant, by virtue of his position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Director Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

87.     The Director Defendants breached their duties of loyalty and good faith by causing the Company to issue false and misleading statements concerning the financial condition of the Company.  As a result, the Company has expended, and will continue to expend, significant sums of money related to investigations and lawsuits and to structure settlements to resolve them.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

88.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the Individual Defendants' breaches of fiduciary duties, gross mismanagement, and other wrongful conduct as alleged herein.

89.    Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

90.    Plaintiff is a current owner of the Company's common stock and has continuously been an owner of the Company's stock during all times relevant to the Director Defendants' wrongful course of conduct alleged herein. Plaintiff understands his obligation to hold stock throughout the duration of this action and is prepared to do so.

91.    Because of the facts set forth herein, Plaintiff has not made a demand on the Board to institute this action against Defendants.  Such a demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

92.    At the time this suit was filed, the Company's Board was comprised of thirteen (13) members including Defendants Fitterling, Davis, Allen, Banister, Bush, DeVard, Dial, Fettig, Hinman, Liebert, Moreno, Wyant, and Yohannes (*i.e.*, the

Director Defendants). Thus, Plaintiff is required to show that a majority of the Director Defendants, *i.e.*, seven (7), cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action

93.     The Director Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.  For the reasons that follow, and for reasons detailed elsewhere in this complaint, Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

## THE DIRECTOR DEFENDANTS ARE
## NOT INDEPENDENT OR DISINTERESTED

**The Director Defendants Each Lack Independence**

94.     Each of the Director Defendants face a likelihood of liability in this action because they caused and/or permitted the Company to make false and misleading statements and omissions concerning the information described herein. Because of their advisory, managerial, and directorial positions within the Company, the Director Defendants had knowledge of material, non-public information regarding the Company and were directly involved in the operations of the Company at the highest levels.

95.     The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no

steps in a good faith effort to prevent or remedy that situation**.**

96.     Each of the Director Defendants, by virtue of their roles, were required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner.  Despite this, the Director Defendants failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

97.     As trusted Company directors, the Director Defendants conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded their duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded their duties to protect corporate assets.

98.     Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

99.     Each of the Director Defendants reviewed, authorized, signed, and thus personally made and/or otherwise permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

100.    Additionally, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

101.    Furthermore, the Director Defendants caused the issuance of the 2025 Proxy Statement. As alleged above, due to the Director Defendants' materially false and misleading statements in the 2025 Proxy Statement, the Company's stockholders voted to approve the proposals in the 2025 Proxy Statement, including the election of the Director Defendants to the Board and the approval of the named executive officer compensation. Thus, the Director Defendants are not disinterested or independent, and demand upon them would be futile.

102.    Because the Director Defendants were each re-elected to serve as directors upon the false and misleading statements in the 2025 Proxy Statement, they not only face a substantial likelihood of liability but also received a material personal benefit in the form of their continued service on the Board and concomitant

compensation and access to inside information. As such, demand is excused as to each of them.

103.   Despite having knowledge of the history of their own misconduct and mismanagement, the Director Defendants have failed to seek recovery for the Company for any of the misconduct alleged herein.

**Defendant Fitterling**

104.   Defendant Fitterling is neither disinterested nor independent and is thus incapable of considering a demand to sue because he (as its CEO) is an employee of the Company who derives substantially all of his income from his employment with the Company, making him not independent.  As such, Defendant Fitterling cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood.

105.   As CEO, Defendant Fitterling also fails the NYSE bright-line independence test as set forth in the NYSE listing rules and cannot, therefore, be considered independent, as admitted by the Company in its 2025 Proxy Statement. As such, Defendant Fitterling could not objectively and disinterestedly consider a demand to sue the Individual Defendants and any demand upon Defendant Fitterling is therefore futile.

106.   Defendant Fitterling also personally reviewed, signed, authorized,

and/or made the false and misleading statements alleged herein during earnings calls, in SEC filings, press releases, and in other public forums. Thus, as a main perpetrator of the wrongdoing alleged herein, Defendant Fitterling is irreconcilably conflicted, faces a substantial likelihood of liability, and cannot consider a demand to sue.

107. In addition, Defendant Fitterling receives lucrative compensation in connection with his employment with the Company. Defendant Fitterling is not independent from the directors serving on the Compensation Committee as they are responsible for evaluating and determining the compensation of the CEO and Executive Officers, including Defendant Fitterling. The purpose of the Compensation Committee is to assist the Board in discharging its responsibilities related to the compensation provided by the Company to its CEO and Executive Officers. Because of his status as an inside director, and the concomitant substantial compensation he receives, Defendant Fitterling could not consider a demand adverse to the other Director Defendants serving on the Compensation Committee who are responsible for his financial future.

108. Because of Defendant Fitterling's participation in the gross dereliction of fiduciary duties, and breaches of the duties of due care, good faith, and loyalty, Defendant Fitterling is unable to comply with his fiduciary duties and prosecute this action. Defendant Fitterling is in a position of irreconcilable conflict of interest in terms of the prosecution of this action and defending himself in the Securities Class

Action.

**Defendants Davis, Bush, DeVard, Dial, Liebert, and Yohannes**

109. Defendants Davis, Bush, DeVard, Liebert, and Yohannes served as members of the Audit Committee. Pursuant to the Company's Audit Committee Charter, the members of the Audit Committee are responsible for, *inter alia,* overseeing the accounting and financial reporting processes of the Company and the audits of the financial statements of the Company and the audits of the financial statements of the Company, and otherwise meet their responsibilities as set forth in the Audit Committee Charter as set forth herein.

110. Defendants Davis, Bush, DeVard, Liebert, and Yohannes breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee, *inter alia*, allowed or permitted false and misleading statements to be disseminated in the Company's SEC filings and other disclosures and, otherwise, failed to ensure that adequate internal controls were in place regarding the serious accounting and business reporting issues and deficiencies described above. Therefore, Defendants Davis, Bush, DeVard, Liebert, and Yohannes face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

**Additional Reasons Demand is Futile**

111. The Company has been and will continue to be exposed to significant

losses due to the wrongdoing complained of herein, yet the Director Defendants have not caused the Company to take action to recover for the Company the damages it has suffered and will continue to suffer thereby.

112.    The Company, at all material times, had its Code of Conduct and related corporate governance policies which required each of the Individual Defendants to maintain the highest standards of honesty and integrity, particularly in relation to accurate and truthful public disclosures. Yet, despite this Code of Conduct and other relevant policies and committee charters, each of the Director Defendants failed to ensure that the Company upheld high standards of integrity, misrepresented facts to the investing public, and failed to report any concerns, or investigate any misconduct, let alone commence litigation against the Individual Defendants.

113.    In violation of the Code of Conduct, the Director Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to cause the Company to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, and unjust enrichment. In violation of the Code of Conduct, the Director Defendants failed to comply with laws and regulations, failed to maintain the accuracy of company records, public reports, and communications, and failed to uphold the responsibilities related thereto. Thus, the Director Defendants face a substantial

likelihood of liability and demand is futile as to them.

114.   The Director Defendants received, and continue to receive, substantial salaries, bonuses, payments, benefits, and other emoluments by virtue of their membership on the Board.  They have benefitted from the wrongs alleged herein and have engaged therein to preserve their positions of control and the prerequisites thereof and are incapable of exercising independent objective judgment in deciding whether to bring this action.

115.   The Director Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company.   Accordingly, demand is excused as being futile.

116.   Publicly traded companies, such as Dow, typically carry director and officer liability insurance from which the Company could potentially recover some or all of its losses.  However, such insurance typically contains an "insured vs.

insured" disclaimer that will foreclose a recovery from the insurers if the Individual Defendants sue each other to recover the Company's damages. If no such insurance is carried, then the Director Defendants will not cause the Company to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability.  Accordingly, demand is futile in that event.

117.    Accordingly, each of the Director Defendants, and at least a majority of them, cannot reasonably consider a demand with the requisite disinterestedness and independence. Indeed, any demand upon the Director Defendants is futile and, thus, excused.

## **FIRST CAUSE OF ACTION**

### **(Against the Individual Defendants for Breach of Fiduciary Duties)**

118.    Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

119.    The Individual Defendants owe the Company fiduciary obligations.  By reason of their fiduciary relationships, the Director Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

120.    The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

121.    The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties.   Among other things, the

Individual Defendants breached their fiduciary duties of loyalty and good faith by allowing the Company to improperly misrepresent the Company's publicly reported financials. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

122. As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

123. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, the waste of corporate assets, and reputational harm.

## SECOND CAUSE OF ACTION

### (Against the Individual Defendants for Gross Mismanagement)

124. Plaintiff incorporates by reference and re-allege each allegation contained above, as though fully set forth herein.

125. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their

responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly held corporation.

126.   As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, the Company has sustained significant damages in excess of hundreds of millions of dollars.

127.   Because of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

## THIRD CAUSE OF ACTION

### (Against the Individual Defendants for Waste of Corporate Assets)

128.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

129.   The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going.  It resulted in continuous, connected, and ongoing harm to the Company.

130.   As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying excessive compensation and bonuses to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend the Individual Defendants'

unlawful actions.

131.   As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

## FOURTH CAUSE OF ACTION

### (Against the Individual Defendants for Unjust Enrichment)

132.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

133.   By their wrongful acts, violations of law, and inaccurate and untruthful information and/or omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and the detriment of, the Company

134.   The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from the Company that was tied to the performance of the Company or its stock price or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

135.   Plaintiff, as a shareholder and representative of the Company, seeks restitution from the Individual Defendants and seek an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based

or valuation-based compensation, obtained by the Individual Defendants due to their

wrongful conduct and breach of their fiduciary and contractual duties.

## FIFTH CAUSE OF ACTION

### (Against the Director Defendants for Violations of Section 14(a) of the Exchange Act)

136.  Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

137.  Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

138.  Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in

order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

139.   The Director Defendants violated § 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), and Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated thereunder by the SEC.

140.   The Director Defendants, individually and in concert, disseminated and/or permitted the dissemination of materially false and misleading statements in the 2025 Proxy Statement filed with the SEC.

141.   The 2025 Proxy Statement was used to solicit shareholder votes in connection with the re-election of the Director Defendants to the Board, among other things.

142.   Under the direction and watch of the Director Defendants, the 2025 Proxy Statement failed to disclose, *inter alia*, that contrary to the 2025 Proxy Statement's description of the Board's risk oversight function, the Board was not adequately exercising these functions, were not monitoring macroeconomic trends, were not equipped for any macroeconomic headwinds, were causing or permitting the Company to issue false and misleading statements, and thus the Director Defendants were breaching their fiduciary duties.

143.   The 2025 Proxy Statement was also false and misleading because by choosing to speak about the Board's oversight of macroeconomic risks, the Director

Defendants were also required to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  The Director Defendants failed to disclose, *inter alia*, Dow's actual ability (or lack thereof) to mitigate macroeconomic and tariff-related headwinds, as well as maintain the financial flexibility needed to support its lucrative dividend. The Director Defendants also failed to disclose the true scope and severity of the foregoing headwinds' negative impacts on Dow's business and financial condition, particularly with respect to competitive and pricing pressures, softening global sales and demand for the Company's products, and an oversupply of products in the Company's global markets. The Director Defendants' failure to disclose these issues violated Item 303 because these issues represented known trends or uncertainties that were likely to have a material unfavorable impact on the Company's business and financial results.

144.   In the exercise of reasonable care, the Director Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2025 Proxy Statement were materially false and misleading.

145.   The materially false and misleading statements contained in the 2025 Proxy Statement misleadingly induced shareholders to vote in favor of the election

of the Director Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company.

146.   The Company was damaged as a result of the Director Defendants' material misrepresentations and omissions in the 2025 Proxy Statement.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for relief and judgment as follows:

A.   Declaring that Plaintiff may maintain this action on behalf of the Company and that Plaintiff is an adequate representative of the Company;

B.   Awarding, against all the Individual Defendants and in favor of the Company, the damages sustained by the Company as a result of the Individual Defendants' breaches of their fiduciary duties, gross mismanagement, waste of corporate assets, and unjust enrichment;

C.   Awarding, against all Director Defendants and in favor of the Company, the damages sustained by the Company as a result of the Director Defendants' violations of Section 14(a) of the Exchange Act;

D.   Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its investors from a recurrence of the damaging events described herein;

E.   Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.   Awarding such other and further relief as is just and equitable.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Dated: September 5, 2025

*/s/ E. Powell Miller*
E. Powell Miller (P39487)
Marc L. Newman (P51393)
Dennis A. Lienhardt (P81118)
**THE MILLER LAW FIRM, P.C.**
950 W. University Drive, Suite 300
Rochester, MI 48307
Tel: (248) 841-2200
Fax: (248) 652-2852
epm@millerlawpc.com
mln@millerlawpc.com
dal@millerlawpc.com

**GAINEY McKENNA & EGLESTON**
Thomas J. McKenna
Gregory M. Egleston
260 Madison Ave., 22nd Floor
New York, NY 10016
Tel: (212) 983-1300
Fax: (212) 983-0383
Email: tjmckenna@gme-law.com
Email: gegleston@gme-law.com

***Attorneys for Plaintiff***